IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-150

No. 102A21

Filed 17 December 2021

IN THE MATTER OF: C.N.R.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 10 December 2020 by Judge Robert J. Crumpton in District Court, Yadkin County. This matter was calendared for argument in the Supreme Court on 6 December 2021, but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*James N. Freeman, Jr., for petitioner-appellee Yadkin County Human Services Agency.*

*Paul W. Freeman, Jr., for appellee guardian ad litem.*

*Richard Croutharmel for respondent-appellant mother.*

*J. Thomas Diepenbrock for respondent-appellant father.*

ERVIN, Justice.

¶ 1 Respondent-mother Joyce R. and respondent-father Joshua R. appeal from an order entered by the trial court terminating their parental rights in their daughter C.N.R.[1] After careful consideration of the parents' challenges to the trial court's termination order, we conclude that the challenged order should be affirmed.

---

[1] "C.N.R." will be referred to throughout the remainder of this opinion as "Corinne," which is a pseudonym used to protect the child's identity and for ease of reading.

In 2016, respondent-mother was charged with misdemeanor child abuse as a result of unsanitary conditions that existed in the family home at the time that the Yadkin County Human Services Agency completed a family assessment. The charge against respondent-mother was dismissed in light of respondent-mother's agreement to maintain the home in an appropriate condition and to take proper care of her children.

On 13 October 2018, HSA received a child protective services report concerning Corinne, who had been born in June 2017, and her two half-siblings. According to this report, law enforcement officers had performed an animal welfare check at the parents' residence, during which they found the three children in respondent-father's care. Upon arriving at the home, a social worker

> found multiple dogs in cages that were soiled with large amounts of animal feces. Furthermore, large quantities of animal feces covered the floors in the home, to the point that it was impossible to traverse a certain room in the home without stepping in animal feces. The entire home had a strong smell of animal urine.

In addition, the social worker observed the presence of dirty dishes throughout the home and "pill bottles on a table in the living room within reach of the children."

Upon making these observations, the social worker contacted respondent-mother and the fathers of the other children and asked them to meet her at the HSA office. After initially denying that she had any responsibility for the conditions that the social worker had observed in the family home in light of the fact that "she had

been at work that day[,]" respondent-mother subsequently acknowledged that the home had been in the same state in which the social worker had found it when respondent-mother left for work that morning.

Corinne's paternal grandmother, who is disabled, told the social worker that she lived in the residence with respondent-mother, respondent-father, and the children and that she had spent the preceding week "unsuccessfully urging [the parents] to either clean the home or move out." In addition, the paternal grandmother reported that respondent-mother "frequently" left the children in her care even though she is "largely unable to care for [them,]" while Corinne's half-sister told the social worker that she had, "on occasion," witnessed the parents "arguing and fighting in the home to the point that it made her cry."

On 15 October 2018, HSA obtained the entry of an order taking Corinne and her half-siblings into nonsecure custody and filed juvenile petitions alleging that the children were neglected juveniles. On 28 November 2018, the parents signed an Out-of-Home Family Services Agreement in which they agreed to (1) complete a parenting education program, provide certificates of completion, and demonstrate appropriate parenting skills during their visits with the children; (2) obtain stable and appropriate housing and employment and demonstrate the ability to provide for the

children's basic needs; and (3) obtain a psychological assessment and complete any recommended treatment.[2]

After a hearing held on 29 November 2018, Judge Jeanie R. Houston entered an order on 10 January 2019 in which she found the children to be neglected juveniles in light of the injurious environment in which they lived. Although Judge Houston awarded legal and physical custody of Corinne's half-sister to the child's father, Corinne and her half-brother remained in HSA custody, with the parents having been granted one hour of biweekly supervised visitation with Corinne, subject to the requirement that they avoid incarceration.

In a ninety-day review order entered on 10 April 2019 following a review hearing held on 7 March 2019, Judge Houston found that, while the parents had been attending visitation sessions with Corinne, they had only engaged in "minimal" interactions with their daughter and had, instead, been "observed to spend much of their visitation time on their cell phones." In addition, Judge Houston ordered the parents to participate in a Marschak Interaction Method assessment at Jodi Province Counseling for the purpose of "clinically evaluat[ing] their approach to parenting[.]"

---

[2] The trial court's orders refer to the existence of an additional requirement in which the parents were obligated to obtain safe, reliable transportation. However, no such provision appears in the version of the family services agreement that is contained in the record on appeal.

Judge William F. Brooks held a permanency planning hearing in this matter on 19 September 2019. In a permanency planning order entered on 6 November 2019, Judge Brooks found that the parents had completed the required parenting classes and had provided the necessary confirmatory information to HSA and that the parents had also obtained the required psychological and Marschak Interaction Method assessments. In addition, Judge Brooks determined that respondent-mother continued to be employed in the same position that she had occupied at the time of the initial review hearing. On the other hand, Judge Brooks found that the parents had yet to procure housing, that they were "living with friends a[t] an unknown address," and that they had not "demonstrated improved parenting skills during" visits, obtained the counseling recommended at the conclusion of their psychological assessments, or complied with the recommendation set out in their Marschak Interaction Method assessment that they "participate in 'theraplay' treatment to learn how to establish structure, firm limits, and clear expectations" for Corinne. Finally, Judge Brooks determined that respondent-father continued to be unemployed. In light of these findings, Judge Brooks established concurrent permanent plans of adoption and reunification for Corinne while concluding that further efforts to reunify Corinne with respondent-mother or respondent-father "would clearly be unsuccessful or inconsistent with the minor [child's] health, safety, and the need for a safe, permanent home within a reasonable period of time." See

N.C.G.S. § 7B-906.2(b) (2019). As a result, Judge Brooks directed HSA to "initiate an action to terminate the [parents'] parental rights within sixty days from the filing of [its o]rder."

¶ 10    On 2 July 2020, HSA filed a motion seeking to have the parents' parental rights in Corrine terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1) (2019; failure to make reasonable progress toward correcting the conditions that had led to Corinne's removal from the family home, N.C.G.S. § 7B-1111(a)(2); and failure to pay a reasonable portion of the cost of Corinne's care, N.C.G.S. § 7B-1111(a)(3). On 24 November 2020, a hearing was held before the trial court for the purpose of addressing the issues raised by the termination motion. On 10 December 2020, the trial court entered an order in which it concluded that both parents' parental rights in Corinne were subject to termination on the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and failure to make reasonable progress toward correcting the conditions that had led to Corinne's removal from the family home, N.C.G.S. § 7B-1111(a)(2), and that respondent-father's parental rights in Corinne were also subject to termination for failure to pay a reasonable portion of the cost of the care that Corinne had received following her removal from the home, N.C.G.S. § 7B-1111(a)(3). In addition, the trial court concluded that the termination of the parents' parental rights

would be in Corinne's best interests. The parents noted appeals from the trial court's termination order to this Court.[3]

In seeking relief from the trial court's termination order before this Court, both parents have argued that the trial court lacked subject matter jurisdiction to enter the challenged termination order on the grounds that the director of HSA, who had verified the termination motion, and the notary public before whom the director had appeared had failed to date the verification attached to the termination motion. *See* N.C.G.S. § 7B-1104 (2019) (providing that a petition or motion for termination of parental rights "shall be verified by the petitioner or movant"). More specifically, the parents pointed out that, while the verification form associated with the motion contained an indication that it had been "[s]worn to and subscribed before me this ___ day of May, 2020," the blank into which the date was to be inserted had not been filled in. In addition, the parents stated that the termination motion had been signed by counsel for HSA on 30 June 2020 and had been filed with the Clerk of Superior Court of Yadkin County on 2 July 2020.

After noting that this Court had opined in *In re T.R.P.* that "[a] trial court's subject matter jurisdiction over all stages of a juvenile case is established when the

---

[3] The certificates of service that accompanied the parents' notices of appeal reflect a failure to effect timely service under N.C. R. App. P. 3.1(b), 26(d). However, given that neither HSA nor the guardian ad litem have objected to the parents' failure to serve their notices of appeal in a timely fashion, "any issue about the deficiency of service has been waived." *In re K.D.C.*, 375 N.C. 784, 787 (2020).

action is initiated with the filing of a properly verified petition," 360 N.C. 588, 593 (2006), and that the Court of Appeals had held that "[a] violation of the verification requirement of N.C.G.S. § 7B-1104 [constituted] a jurisdictional defect *per se*," *In re T.M.H.*, 186 N.C. App. 451, 454 (2007) (citing *In re Triscari Children*, 109 N.C. App. 285, 287–88 (1993)); *accord In re C.M.H.*, 187 N.C. App. 807, 809 (2007) (stating that "[p]etitioner's failure to verify the petition to terminate parental rights left the trial court without subject matter jurisdiction"), the parents insist that, since a notarial certificate associated with an oath or affirmation must include the date upon which the oath or affirmation had been made, N.C.G.S. § 10B-40(d) (2019), the termination motion had not been properly verified, so that the trial court lacked the subject matter jurisdiction necessary to terminate their parental rights in Corinne.

¶ 13         In response, HSA and the guardian ad litem argue that the failure to date the verification that had been attached to the termination motion did not deprive the trial court of subject matter jurisdiction over the termination proceeding. More specifically, HSA and the guardian ad litem argue that the trial court obtained jurisdiction over this case on 15 October 2018, when HSA filed a properly verified juvenile petition in accordance with N.C.G.S. § 7B-403(a) (2019), in which it alleged that Corinne was a neglected juvenile, citing *In re T.R.P.*, 360 N.C. at 593 (stating that, "[n]ot only did the General Assembly provide that a properly verified juvenile petition would invoke the jurisdiction of the trial court, *it further provided that*

*jurisdiction would extend through all subsequent stages of the action*" (emphasis added)). In addition, HSA and the guardian ad litem argue that, even if the verification requirement of N.C.G.S. § 7B-1104 is jurisdictional with respect to a termination motion filed pursuant to N.C.G.S. § 7B-1102, the director's failure to date her verification of the termination motion in this case does not constitute a fatal defect that would deprive the trial court of subject matter jurisdiction.

> Jurisdiction is the legal power and authority of a court to make a decision that binds the parties to any matter properly brought before it. The court must have personal jurisdiction and, relevant here, subject matter jurisdiction or jurisdiction over the nature of the case and the type of relief sought, in order to decide a case. The [L]egislature, within constitutional limitations, can fix and circumscribe the jurisdiction of the courts of this State. Where jurisdiction is statutory and the Legislature requires the Court to exercise its jurisdiction in a certain manner, to follow a certain procedure, or otherwise subjects the Court to certain limitations, an act of the Court beyond these limits is in excess of its jurisdiction.

*Catawba Cnty. ex rel. Rackley v. Loggins*, 370 N.C. 83, 88 (2017) (cleaned up). "Whether or not a trial court possesses subject-matter jurisdiction is a question of law that is reviewed de novo. Challenges to a trial court's subject-matter jurisdiction may be raised at any stage of proceedings, including for the first time before this Court." *In re A.L.L.*, 376 N.C. 99, 101 (2020) (cleaned up). On the other hand, "[t]his Court presumes the trial court has properly exercised jurisdiction unless the party

challenging jurisdiction meets its burden of showing otherwise." *In re L.T.*, 374 N.C. 567, 569 (2020).

¶ 14      The district court division of the General Court of Justice has "exclusive original jurisdiction to hear and determine any petition or motion relating to termination of parental rights to any juvenile who resides in, is found in, or is in the legal or actual custody of a county department of social services or licensed child-placing agency in the district at the time of filing of the petition or motion." N.C.G.S. § 7B-1101 (2019); *see also* N.C.G.S. § 7B-101(6) (2019).   According to N.C.G.S. § 7B-1102(a), "[w]hen the district court is exercising jurisdiction over a juvenile and the juvenile's parent in an abuse, neglect, or dependency proceeding, a person or agency specified in [N.C.]G.S. [§] 7B-1103(a) may file in that proceeding a motion for termination of the parent's rights in relation to the juvenile," N.C.G.S. § 7B-1102(a) (2019), with any such motion to "be verified by the petitioner or movant." N.C.G.S. § 7B-1104.

¶ 15      In *In re O.E.M.*, 2021-NCSC-120, we recently held that compliance with the verification requirement set out in N.C.G.S. § 7B-1104 is necessary for the trial court to obtain subject matter jurisdiction over a termination of parental rights proceeding initiated by the filing of a motion pursuant to N.C.G.S. § 7B-1102. *Id.* ¶ 20–21 (stating that "[a] petitioner or movant must satisfy distinct requirements to vest a trial court with jurisdiction to conduct a juvenile proceeding on the one hand and a termination

proceeding on the other"). In light of that fact, we further held that a movant's failure to verify a termination motion as required by N.C.G.S. § 7B-1104 has the effect of depriving the trial court of jurisdiction to terminate a parent's parental rights in a child. *Id.*, ¶28; *see also In re T.R.P.*, 360 N.C. at 590 (2006) (characterizing subject matter jurisdiction as "[j]urisdiction over the nature of the case *and the type of relief sought*" (alteration in original) (emphasis added) (quoting *Jurisdiction. Black's Law Dictionary* (7th ed. 1999)). As a result, we agree with the parents that a termination motion must comply with the verification requirement in N.C.G.S. § 7B-1104 in order for the trial court to have subject matter jurisdiction over a termination of parental rights proceeding, so that the ultimate question before us in this case is whether the termination motion that HSA filed in this case was properly verified.

¶ 16      The Juvenile Code does not prescribe a method for verifying a petition or motion as required by N.C.G.S. §§ 7B-403 and 7B-1104. Acting in reliance upon the relevant portions of the North Carolina Rules of Civil Procedure, we have held that "[a] pleading is verified by means of an affidavit stating 'that the contents of the pleading verified are true to the knowledge of the person making the verification, except as to those matters stated on information and belief, and as to those matters he believes them to be true,'" *In re N.T.*, 368 N.C. 705, 708 (2016) (quoting N.C.G.S. § 1A-1, Rule 11(b) (2015), and that "[a]n affidavit is a written or printed declaration or statement of facts, made voluntarily, and confirmed by the oath or affirmation of

the party making it, taken before an officer having authority to administer such oath," *In re S.E.T.*, 375 N.C. 665, 672 (2020) (cleaned up). According to N.C.G.S. § 1-148, "[a]ny officer competent to take the acknowledgment of deeds, and any judge or clerk of the General Court of Justice, notary public, in or out of the State, or magistrate, is competent to take affidavits for the verification of pleadings." N.C.G.S. § 1-148 (2019). Aside from the fact that neither N.C.G.S. § 1A-1, Rule 11(b), nor N.C.G.S. § 1-148 (nor, for that matter, our decision in *In re S.E.T.*) requires that an affidavit used to verify a pleading must contain the date upon which the verification was made, nothing in N.C.G.S. § 1-148 requires that an affidavit used to verify a motion or other pleading be certified by a notary in accordance with the Notary Public Act, N.C.G.S. §§ 10B-1 to 10B-146 (2019). *Cf. In re N.T.*, 368 N.C. at 708 (upholding the validity of a verification that had been signed before a magistrate).

¶ 17        In this case, the director of HSA verified the termination motion by signing the following printed statement before a notary public:

> [The director], being first duly sworn, says: She is the Director of the Yadkin County Human Services Agency, Movant in the entitled action; she has read the foregoing Motion, knows the contents thereof, and the same is true to her own knowledge except as to those matters as are therein stated on information and belief, and as to those matters, she believes them to be true.

The director signed the verification form below printed text stating that the verification had been "[s]worn to and subscribed before me this ___ day of May, 2020,"

with that verification form having also identified the notary as a "Notary Public" and having included her notarial stamp and the date upon which her commission expired, which was 14 October 2023. *See* N.C.G.S. §§ 10B-3(4), 10B-9 (2019). As a result, the language contained on the verification page identified the notary as a person "competent to take affidavits for the verification of pleadings" for purposes of N.C.G.S. § 1-148, *see* N.C.G.S. § 10B-20(a)(2) (2019), and satisfies the requirements for attesting to a "notarial act" set out in N.C.G.S. § 10B-20(b).

As the parents have observed, the Notary Public Act prescribes more formal requirements for a "notarial certificate" associated with an oath inscribed in a notarized "record."[4] *See* N.C.G.S. § 10B-3(12) (defining a "notarial certificate" as "[t]he portion of a notarized record that is completed by the notary, bears the notary's signature and seal, and states the facts attested by the notary in a particular notarization"); *see also* N.C.G.S. § 10B-3(19) (defining a "record" as "[i]nformation that is inscribed on a tangible medium and called a traditional or paper record"). Subsection 10B-40(d) provides that:

> [a] notarial certificate for an oath or affirmation taken by a notary is sufficient and shall be accepted in this State if it is substantially in the form set forth in [N.C.]G.S. [§ 10B-43, if it is substantially in a form otherwise prescribed by the laws of this State, or if it includes all of the following:

---

[4] The notary's act in having the director swear to the truth of the contents of the termination motion constitutes the administration of an "oath" for purposes of N.C.G.S. § 10B-3(14) (2019).

(1) Repealed . . . effective October 1, 2006.

(2) Names the principal who appeared in person before the notary unless the name of the principal otherwise is clear from the record itself.

(3) Repealed . . . effective October 1, 2006.

(4) Indicates that the principal who appeared in person before the notary signed the record in question and certified to the notary under oath or by affirmation as to the truth of the matters stated in the record.

(5) *States the date of the oath or affirmation.*

(6) Contains the signature and seal or stamp of the notary who took the oath or affirmation.

(7) States the notary's commission expiration date.

N.C.G.S. § 10B-40(d) (emphasis added). As a result, the notary's failure to date the administration of the oath to the director would constitute a defect in a notarial certificate for purposes of N.C.G.S. § 10B-40(d)(5).[5]

---

[5] The guardian ad litem argues that, since the director's verification of the termination motion constitutes an "acknowledgment" under the Notary Public Act, rather than an oath, the relevant notarial certificate for an acknowledgment need not include the date. *See* N.C.G.S. §§ 10B-3(1), -40(a1)(b), -41(a) (2019). However, given that the act of verifying a pleading requires the individual to vouch for the truth of the allegations contained in the relevant pleading, *In re O.E.M.*, 2021 NCSC-120, ¶¶ 15–18, the notary is necessarily involved in the administration of an oath or affirmation within the meaning of N.C.G.S. § 10B-3(2) or (14) (2019) during the verification process, *see* N.C.G.S. § 1A-1, Rule 11(b), while an acknowledgment, on the other hand, merely requires an individual to confirm that he or she is the person who signed the document. N.C.G.S. § 10B-3(1). As a result, we do not find this aspect of the guardian ad litem's response to the parents' argument to be persuasive.

¶ 19       On the other hand, the Notary Public Act contains a savings clause that accords a "presumption of regularity" to notarized documents despite the existence of minor technical defects in the notarial certificate. N.C.G.S. § 10B-99(a) (2019). N.C.G.S. § 10B-99 provides that,

> [i]n the absence of evidence of fraud on the part of the notary, or evidence of a knowing and deliberate violation of this Article by the notary, the courts shall grant a presumption of regularity to notarial acts so that those acts may be upheld, provided there has been substantial compliance with the law.

*Id.*; *see also* N.C.G.S. § 10B-68(a) (2019) (providing that "[t]echnical defects, errors, or omissions in a notarial certificate shall not affect the sufficiency, validity, or enforceability of the notarial certificate or the related instrument or document").[6] As far as we have been able to ascertain, the record contains no suggestion that any fraudulent conduct or a knowing violation of the Notary Public Act occurred in connection with the verification of the termination motion at issue in this case. Moreover, given that neither N.C.G.S. § 1A-1, Rule 11(b), nor N.C.G.S. § 1-148 require that a verified pleading be notarized, *see In re N.T.*, 368 N.C. at 708, we need not

---

[6] A technical defect for purposes of N.C.G.S. § 10B-99(a) encompasses those deficiencies that are subject to being cured pursuant to N.C.G.S. § 10B-37(f) and N.C.G.S. § 10B-67 and includes, but is not limited to, "the absence of the legible appearance of the notary's name exactly as shown on the notary's commission as required in [N.C.]G.S. [§] 10B-20(b), the affixation of the notary's seal near the signature of the principal or subscribing witness rather than near the notary's signature, minor typographical mistakes in the spelling of the principal's name, the failure to acknowledge the principal's name exactly as signed by including or omitting initials, or the failure to specify the principal's title or office, if any." N.C.G.S. § 10B-68(c) (2019).

determine whether non-compliance with the date requirement set out in N.C.G.S. § 10B-40(d)(5) would have the effect of invalidating the specific type of verification that is at issue in this case. *Cf. In re Simpson*, 544 B.R. 913, 920 (Bankr. N.D. Ga. 2016) ("conclud[ing] that the failure of [the notary] to insert the date of his notarial act of acknowledgment invalidates the acknowledgment" because "[t]he date of acknowledgment can be important for numerous reasons affecting the validity and authenticity of the deed"). As a result, we are satisfied that the director's action in signing the verification before the notary constituted "substantial compliance" for purposes of N.C.G.S. § 10B-99(a). *Cf. In re N.T.*, 368 N.C. at 706 (deeming that a petition sufficed to confer subject matter jurisdiction in a termination proceeding in a case in which "[t]he verification section [contained] a space for " 'Signature of Person Authorized to Administer Oaths' " that bore a signature consisting of the letter "C" followed by "an illegible signature" and that, despite the existence of "a space for the person's title," that space "ha[d] not been filled in with any title").

¶ 20    The parents point out that the verification page in which the applicable date should have been recorded refers to "this ___ day of May, 2020" and argue that any date in May 2020 would have preceded the date upon which counsel for HSA signed the termination motion, an event that occurred on 30 June 2020. In light of that fact, the parents contend that the director had either "verified a [termination of parental rights] motion that was not yet in existence" or had, at best, "verified the motion at

least [thirty] days before the motion was finalized and signed by the HSA attorney on 30 June 2020." We are loath, however, to assume, without more, that the factual scenario upon which the parents' arguments rest accurately reflects what happened in the period of time leading up to the filing of the termination motion. In our view, it is equally, if not more, likely that the person who prepared the verification simply failed to update that document to correspond with the date shown upon the signature page associated with the termination motion and we are unwilling, for that reason, to infer from what might well have been a clerical oversight or some similar omission by the notary a finding that the director swore to the accuracy of a non-existent or inchoate pleading[7] in light of the well-established presumption of regularity that applies to a trial court's decision to exercise its jurisdiction, *see In re L.T.*, 374 N.C. at 569, and the presumption of regularity afforded to notarial acts pursuant to N.C.G.S. § 10B-99(a).

The significant date for purposes of a termination proceeding is the date upon which the motion or petition was filed rather than the date upon which the petition

---

[7] We note that the termination of parental rights motion at issue in this case does not allege the occurrence of any event that happened subsequent to the May 2020 time period shown on the verification page. Assuming, without in any way deciding, that a verification that purports to address events occurring after the date upon which that verification was signed would be legally deficient and that the director signed the verification at issue in this case in May 2020, there is nothing in the record that suggests the existence of any impropriety on the part of either the director or the notary that might suffice to defeat the presumption of regularity created by N.C.G.S. § 10B-99(a) arising from the presence of "May, 2020" on the verification page attached to the termination motion.

or motion was signed or verified. *See* N.C.G.S. § 7B-1111(a)(2)–(5), (7) (2019); *see also In re K.H.*, 375 N.C. 610, 613 (2020) (stating that "the twelve-month period [applicable to the ground for termination enunciated in N.C.G.S. § 7B-1111(a)(2)] begins when a child is left in foster care or placement outside the home pursuant to a court order, and ends when the motion or petition for termination of parental rights is filed"); *id*. at 616 (stating that "[t]he motion to terminate respondent's parental rights was filed on 8 August 2018," so that "the relevant six-month period [under N.C.G.S. § 7B-1111(a)(3) for the purpose of] determin[ing] whether respondent was able to pay a reasonable portion of the cost of [the juvenile's] care but failed to do so was from 8 February 2018 to 8 August 2018"). As a result, we are unable to conclude that either N.C.G.S. § 1A-1, Rule 11(b), or N.C.G.S. § 1-148 requires that the verification of a termination of parental rights petition or motion occur contemporaneously with or subsequent to the signing of any such pleading. *Cf. Boyd v. Boyd*, 61 N.C. App. 334, 336 (1983) (requiring a complaint for divorce to be verified prior to filing).

¶ 22    "[G]iven the magnitude of the interests at stake in juvenile cases . . ., the General Assembly's requirement of a verified petition is a reasonable method of assuring that our courts exercise their power only when an identifiable government actor 'vouches' for the validity of the allegations in such a freighted action." *In re T.R.P.*, 360 N.C. at 592. A careful review of the record and the applicable law satisfies

us that the director's verification of the contents of the termination motion that was filed in this case satisfied the concerns that underlie the verification requirement enunciated in N.C.G.S. § 7B-1104 despite the notary's failure to record the date upon which the verification was made. For that reason, we hold that the termination motion at issue in this case substantially complied with the verification requirement enunciated in N.C.G.S. § 7B-1104 and sufficed to give the trial court subject matter jurisdiction to terminate the parents' parental rights in Corinne. In view of the fact that neither parent has advanced any challenge to the merits of the trial court's termination order, we affirm the trial court's order terminating the parents' parental rights in Corinne.[8]

AFFIRMED.

---

[8] After the filing of the parent's briefs, HSA filed a motion to amend the record on appeal to include affidavits executed by the director and the notary on 27 April 2021. In her affidavit, the director attests to having verified the termination motion before the notary on 23 June 2020. Similarly, the notary asserted that she was working and available to notarize the director's signature on 23 June 2020; that her signature and notary stamp appear on the verification page associated with the termination motion and "indicat[e] that [she] notarized [the director's] signature on the document"; and that she had "inadvertently left out the date [o]n which [she] notarized [the director's] signature on [the] verification page for the Motion to Terminate Parental Rights[.]" As the parents have observed in opposing the allowance of the amendment motion, these affidavits were not contained in the record developed before the trial court as required by N.C. R. App. P. 9(b)(5)(b). In addition, the amendment motion does not allege that the notary has amended the verification to include the date upon which the director swore to the contents of the termination motion. *Cf. Lawson v. Lawson*, 321 N.C. 274, 275, 278 (1987) (upholding the parties' separation agreement in light of the fact that the notary had amended the notarial certificate to add his notarial seal and acknowledgment "some two years after the document had been signed"). In light of our decision to affirm the trial court's termination order on the grounds discussed above, however, we dismiss HSA's amendment motion as moot.